*The probate of the paper propounded as the Will of*
MOSES W. S. JACKSON.

WHERE the heir and next of kin was a minor, having a general guardian,
and the petitioner for probate averred that such minor had no general
guardian, and the Surrogate thereupon appointed a special guardian,
the probate was revoked because the general guardian was entitled
to be cited.

A will, contested on the ground of mental incapacity, admitted to pro-
bate.

The Court of Appeals having considered the evidence of formal execu-
tion imperfect, inasmuch as that Court doubted, from the evidence,
whether the testator had signed the will before or after the subscribing
witnesses, the proceeding was remitted to the Surrogate for further
testimony, who found as before, and admitted the will to probate a
third time.

SAMUEL F. COWDREY *and* JOHN E. PARSONS, *for Proponent.*
A. R. DYETT *and* WM. H. TAGGARD, *for Contestant.*

ANNA MARGARET JACKSON presented her petition to
the acting Surrogate of New York on the 16th day of
August, 1862, setting forth that she was the widow of
Moses W. S. Jackson, deceased, and a person named as
executrix in the last will and testament of said decedent;
that said decedent was, at, or immediately previous to his
death, an inhabitant of the township of Bergen, in the
county of Hudson, in the State of New Jersey, and departed
this life in said county on the 11th day of August, 1862;
that said last will and testament relates to both real
and personal estate; and that the only next of kin of the
decedent was Moses W. Sherwood Jackson, a minor,
having no general guardian.

Upon this petition, the Acting Surrogate issued citation
to the next of kin, and appointed Gabriel Van Cott,
Esq., special guardian, to represent his interests on the
probate proceeding. The depositions of the subscribing
witnesses were taken, and, on the 1st day of September,
1862, the Acting Surrogate admitted the paper to probate

as the last will and testament of the decedent, and issued letters testamentary to David S. Jackson, as sole acting executor.

On the 12th day of May, 1864, a petition was presented to the Surrogate by Elsie Farrand, general guardian of the infant, Moses W. Sherwood Jackson, setting forth that she had been appointed general guardian for said infant by the former Surrogate of New York, on the 10th day of February, 1860, and that no notice of the proceeding for probate of the will had been served upon her, and that she desired to appear and contest said will on behalf of her ward, and praying that the probate be revoked and opened. On examining the records of the Surrogate's office, and finding the record of this appointment of Elsie Farrand as general guardian, the Surrogate, on the 20th day of June, 1864, entered an order revoking the probate.

On the 24th day of August, 1864, the will was again offered for probate by Anna Margaret Jackson; and a citation to Elsie Farrand as general guardian, and to Moses W. Sherwood Jackson as heir-at-law and next of kin, was issued and served upon both. They gave notice of appearance, and of contest of the will.

The following is the paper propounded:

In the name of God: Amen. I, Moses W. S. Jackson, of township of Bergen, Hudson county, and State of New Jersey, being of sound mind and memory, make and publish my last will and testament in manner following—that is to say: First, It is my will, and I do order, that all my just debts and funeral expenses be duly paid and satisfied as soon as conveniently can be after my decease. I give and devise unto my beloved wife Anna Margaret all my lands, tenements, and hereditaments and real estate to her sole use and benefit forever, without the control of any other person whatsoever, during her natural life, sell and dispose of the same as she may think proper, said property situate in the city of New York, State of New

THE PROBATE OF THE WILL OF MOSES W. S. JACKSON.

York, also all my real estate in the township of Bergen and Bayoun, in Hudson county and State of New Jersey. I give and bequeath unto my wife Anna Margaret all my personal estate of every kind and description, to dispose of the same as she may think proper. I give and bequeath unto my son Moses W. S. Jackson the sum of five hundred dollars to be paid to my executors hereafter named. And I do hereby constitute my wife Anna Margaret, David D. Jackson, and Francis P. Miller, executors of this my last will and testament.

In witness whereof, I have hereunto set my hand and seal the eleventh day of August, one thousand eight hundred and sixty-two.

MOSES W. S. $\underset{\text{mark.}}{\overset{\text{his}}{\bowtie}}$ JACKSON. [L. s.]

Signed, published, and declared to be his last will and testament in the presence of us, who were present at the same time, and subscribed our names as witnesses in his presence.

FRANCIS P. MILLER,
HENRY P. FISHER,
CHAS. DAVIS.

Miller and Davis were examined as witnesses on this trial. The former testified as follows:

Francis P. Miller, called for proponent, resides at Bergen Point, county of Hudson, New Jersey; resided there in August, 1862; is Justice of the Peace and Commissioner of Deeds; knew the decedent in his lifetime; the decedent resided at Bergen Point; the witness' name is subscribed to the paper propounded; witness drew that instrument; got his instructions from the decedent; the decedent put the mark there, opposite the seal on the instrument, shortly after the witness had drawn it; he supposes a few minutes after; five or ten minutes, probably; witness drew the paper at decedent's residence, at Bergen Point, and in his presence; decedent was then ill;

he had been ill some time; he was confined to the bed.; witness signed the will as a witness at the request of decedent; the decedent requested witness to sign it, and to get witnesses, good, substantial witnesses; he called it his last will and testament; the witness got Dr. Fisher and Mr. Davis, the next neighbor, and they both signed it; they came in separately; Dr. Fisher came first; Fisher was there all the time, pretty much; he attended there; Fisher was not decedent's attending physician, but boarded next door, and was there a great deal of the time, attending, and was very useful; decedent said to witness: "You get your witnesses;" this witness said: "There is Dr. Fisher;" decedent said: "Get good witnesses; get freeholders;" the witness said: "There is Mr. Davis;" Davis was at that time at home; Fisher was in the room; there was no conversation passed between decedent and Fisher; decedent requested Fisher to sign the paper, and witness requested it; witness don't recollect that anything passed respecting the will, at all, further than that; recollects no further than that decedent requested Fisher to sign it, and that it was done with decedent's approbation and consent; don't think the testator called the paper by any name at that time; but it was done with decedent's approbation; can't say the exact words decedent did say; Fisher signed it then; witness don't know whether he, witness, signed it before Dr. Fisher or not; then they sent for Mr. Davis; Davis came in; he spoke to decedent when he came in; decedent said to Mr. Davis: "Go to Mr. Miller; he has got the will;" then witness gave decedent the will and requested him to read it, and decedent told Mr. Davis he did not wish to read it; he was satisfied; and decedent requested Mr. Davis to sign it, and decedent acknowledged it as his last will and testament; decedent had resided at Bergen Point twelve years, witness should say; witness had known him not less than ten years, and may be twelve years.

*Cross-examined.*

The room where decedent lay was a small room, probably twelve feet by ten feet, on the north side of the house; he was lying in bed; when witness had drawn this paper propounded, he forgets whom he first gave it to—whether to the decedent or to his wife (the proponent); witness drew the paper in the same room in which decedent was lying, writing upon a table, at the foot of the bed; witness sat about four or five feet from decedent's head, at the corner of the bedstead; it was signed by decedent the same morning, probably an hour after it was completed—can't say exactly; the witness was not out of the room from the time he commenced it until decedent signed it; the wife of decedent, and his mother-in-law, were also in the room during that hour before decedent signed the paper; forgets the mother-in-law's name; Shaefer, he thinks; don't know whether that is the name; there were several others in the room; all the conversation that passed between the decedent and the proponent during that hour was, she came in and wanted to know whether it was best for her to retire, and he said "no," and she ascertained he was making his will; there was not any conversation during that hour between the decedent and some one else; witness don't think there was any person spoke to decedent except Davis; witness asked decedent how he, decedent, wanted the will executed, and decedent told him, and was very particular; decedent said he was going to make his will; no conversation at all took place, that witness knows of, after witness had completed the will; don't recollect hearing anybody speak to decedent at all—nothing more than ordinary—to give him refreshments; something like that.

Q. What was his physical condition then, very low, indeed? A. Yes, sir; feeble.

Q. He was evidently dying? A. He was probably confined about two or three weeks to his bed.

Q. Was he evidently dying at this time? A. Feeble, same as he had been several days.

Q. Becoming more and more feeble? A. The presumption was that his time was short to appearances; no doubt he felt so. The voice of decedent was feeble, not as strong as in a state of health; could hear him distinctly four or five feet off, saying, " I am making my will myself."

Q. I am merely asking as to the conversation during this hour, in which you say he was quiet there after you drafted the will? A. There was no conversation passed that I know of betwixt him and me, or any person, without it was some person came in and handed him something, and rendered him some assistance, but no conversation at at all, in no shape, by no person.

Q. At the expiration of this hour, what took place then? A. I stayed a short time, and went home.

Q. Did not you go and get the witnesses? A. No, sir; Mr. Fisher was present in the room, and he requested him to sign it.

Q. At the expiration of an hour, tell me what took place in your view and your hearing? A. Nothing transpired that I know of, nothing more than the man laid in his bed, and others were attending, the same as generally occurs in a case of sickness; I don't know of anything that transpired.

Q. Was not there conversation between him and the witnesses after that? A. No, sir; I don't think there was, whatever; if he said anything, it was to some attendants; I don't recollect he said anything.

Q. After this hour and until you left the house? A. All that I heard him say in that room was while he was making his will.

Q. You say one hour transpired between the time you drew the will and he signed it? A. I presume it was.

Q. Now, I want to know what was said between him and any party after that? A. I don't know that any conversation transpired whatever betwixt him and any other

individual after the expiration of the hour. I don't recollect anything of the kind.

Q. What time of the day was it that you completed the drawing of the will?

Witness completed the drawing of the will probably between ten and eleven in the morning; it is impossible to tell particularly; it occupied witness about an hour, he should judge; it might have been more; not much more; don't know that he got up from his seat all the time he was so engaged in drawing it, without it was for some one to pass through; witness went there that day because a person came to his house and requested him to go to decedent's house, as decedent wanted to see him; thinks it was William Jackson, decedent's son, who came for him; witness went shortly afterwards; probably fifteen minutes after; as soon as witness could conveniently leave; witness knew decedent was sick; the messenger did not say what decedent wanted; witness did not take pen, ink or paper with him; got there fifteen or twenty minutes afterwards; presume it was twenty; it was probably nine o'clock in the morning; it might have been before; cannot exactly tell the hour; witness saw decedent on the bed, went to him, and he spoke to witness; the decedent said to witness that he, decedent, wanted to get married, and said he wanted to make his will; then he gave the instructions how he wanted his will made; witness cannot say whether he, witness, said "good morning" or not, to decedent, when he went to the bedside; decedent said that he wanted to make his will; that he wanted to get married; those were the express words he said; then witness went immediately home to get pen and paper to draw up the will; witness did not ask the decedent whom he wanted to get married to; did not ask him if the lady was there to whom he wished to get married.

Q. Did you ask him any of the particulars of his will, as to how long the will would be, or anything of that

kind; what amount of paper it would require? A. No, sir; nothing of the kind; I merely asked him how he wished to dispose of his property, and he told me.

Q. You said, a moment ago, that the very moment he said he wanted to get married, and wanted a will drawn, you left for paper; was it before or after you went for the paper? A. I went for the paper when he first made the request known to me.

Q. How long were you gone for the paper? A. Probably about half an hour.

Q. Who was in the room when you returned? A. There were several; I cannot say; they went in and out one room to another; I cannot designate.

Q. Name any you remember seeing there? A. I don't recollect, just at that moment, who were there, but they were in and out.

Q. Name one person you recollect seeing there? A. His mother, Mrs. Shaefer, and, I presume, Dr. Fisher, because he was in and out all the time, back and forth, constantly; they were not all sitting down as I am; they were in and out.

Q. Can you recollect any one else? A. Mrs. Jackson, I think she was there.

Q. Who is Mrs. Jackson? A. His present wife.

Q. Was he then married to her at this time you returned? A. Yes, sir.

After witness returned with pen, ink and paper, witness asked the decedent how he wished to dispose of his property; witness remembers the exact words in which decedent answered that question.

A. First, he said, "I give all my property to my wife." Said I, "You have got property in New York." "Well," said he, "my property here and my property in the State of New York, I give to my wife, Anna M. Jackson; that is, the real estate." Said I, "You have personal property, how do you wish to dispose of that?" Said he, "I give all my personal property of every kind and description to

her sole use and benefit." Them are the words he said. Then I recollect saying to him, "What after her death?" Said he, "Let her manage that herself."

Q. Give the exact words in which he told you how he wished to dispose of his property; have you answered that completely? A. I presume you have got it all.

Q. He did not say anything else, or use any other words than you have testified to? A. I don't recollect any further than what I have stated. He said, "I am making my will, and not Mr. Miller." I recollect he said that.

This conversation took place immediately on witness' entrance into the room; is positive of that; after these directions were given, the witness took a seat at the table spoken of before; witness gave the decedent the will to examine; decedent said, "One thing at a time. I won't sign that until I sign the certificate." *This was after the will was executed;* don't recollect that any other conversation passed; nothing transpired that witness recollects, any further than about being married.

Q. Did not you testify, on the examination before, that Mr. Jackson dictated that will, word for word, while you was there sitting down drawing it? A. I cannot tell until I see it; give me the affidavit, and I can tell whether it is mine. I know what you say now, and I answer as correct as I possibly can.

Q. Do you recollect what you swore to on the former examination in this matter? A. In substance, I do.

Q. Then did you, or did you not, swear on your former examination that you drew this will from the dictation of Mr. Jackson?

[Objected to that the paper should be shown the witness. Objection sustained.]

At the expiration of the hour, witness took the propounded paper to decedent, and decedent said, "I will not sign it now, one thing first." This was shortly after witness had completed drawing the paper; ten minutes, five minutes, or twenty minutes after; decedent was sit-

ting up at that time; didn't see any pillows or bolsters about him, no support at his back, to witness' recollection; thinks there was a book, some kind of a copy-book, handed to decedent to sign the paper upon; witness don't know whether he handed it to decedent, or not; witness, at that time, stood at the side of the bed, and handed decedent the will; either witness or Dr. Fisher handed it to him; witness or Fisher handed him a pen; decedent tried several times to sign his name, his hand trembled; decedent never did write a fair hand at best times; his hand trembled, consequently he made his mark; every person's hand more or less trembles; decedent's hand trembled about as much as that (witness illustrates); so decedent came to the conclusion to make a cross; witness is not certain whether, when decedent was trying to write his name, the pen touched the paper or not; knows decedent held the pen in position to write, but whether the pen touched the paper then, he does not know.

Q. He found out, after trying some time, that he could not write his name; did he say anything then? A. He said he would make his cross.

Q. Did he make that cross? (Shows witness the will propounded.) A. Yes, sir.

Q. Did you, or any one else, have hold of his hand? A. I had hold of his pen; he touched the end of his pen with his finger.

Q. Who was near there at the time, around the bed? Name them, as fast as you recollect them. A. I think Dr. Fisher was; there were several others, I don't know who; Mrs. Latourette was there, one time; I am not sure whether she was there then; they were in and out; there was no one there constantly; people were in a few minutes, and then out in the next room, and so on.

Q. Who wrote his name there—"Moses W. S. Jackson"? A. I wrote it.

Q. When did you write that? A. I wrote it after the

will was executed, the same day, the same morning, as soon as ever I completed it.

Q. What else did he say, except that he would make his mark, he could not write? A. Nothing more respecting the will, that I recollect; nothing more transpired respecting the will; he gave no further instructions; the will was executed and he was satisfied; except that he said something in respect to his marriage.

Q. Did he say anything after this in respect to his marriage? A. I do not know whether it was afterward or before; it was the same morning, just about the same time; I have nothing to refresh my memory with the particulars; I made no memorandum; he was married previous to that.

Q. After that mark was made, what, if anything, did he say in reference to that paper? A. Nothing, to my recollection; I don't recollect that he said anything about it. * * *

Q. You say he acknowledged it; let me know when that was, precisely; where he stood, and you, and give the exact words? A. He was in bed, and I at the side of the bed.

Q. Was he then sitting up or lying down? A. He was sitting up; he was about signing it; sitting up in bed; he made his cross and acknowledged it.

Q. You say he made his cross; that he could not write; tell me the exact words he said, after that? A. He acknowledged it to be his last will and testament.

Q. I don't care what he acknowledged? A. That is what he said.

Q. Give me the words? A. Acknowledged it to be his last will and testament.

Q. You are sure he said "his last will and testament?" A. Yes, sir.

Q. Are you sure he used the word "his?" A. Yes, sir.

Q. After that, did he then request you to go and get

witnesses, and if he did, what did he say? A. He asked me to get witnesses before he made his cross.

Q. Did they sign the will before it was executed or afterward? A. The witnesses signed it, and he made his cross.

Q. Did he make his cross before or after they signed it? A. *Afterward.*

*Re-direct.*

Witness solemnized a marriage that morning between the decedent and the proponent, as a Justice of the Peace; her maiden name was Shaefer; she and Mr. Jackson had lived together there, as man and wife, probably ten or twelve years; probably fifteen years; witness solemnized this marriage after he came back from going out for the paper.

Q. What was the first thing you did after coming back? A. They were married first, and he said the certificate must be signed first before I presented the will.

Q. You first married them? A. I did, and he signed the certificate.

Q. The certificate was drawn up? A. Yes, sir, and was signed by witnesses.

Q. Was that before or after you took his instructions about the will? A. That was first.

Q. Then you took his instructions? A. "One thing first," he said; "the certificate must be made out first;" he wouldn't sign the will until that was done; said he: "One thing first."

The witness was requested by decedent to give the legacy to Moses W. Sherwood Jackson, the contestant; the decedent mentioned Sherwood Jackson; that he should be left five hundred dollars; when the will was drawn and presented to decedent he, at first, refused to sign it; said he: "One thing first. Get out the certificate, and that must be done first, and solemnized according to law;" witness drew up the certificate; decedent signed it, and witness gave it to proponent; then decedent was ready

to sign the will; the witness wrote the name ".Moses W. S. Jackson, his mark," at the time the will was presented to the decedent to sign; the decedent's memory was sound, and his mind, and good understanding, that morning; witness don't know where Dr. Fisher is now; Mr. Davis had been next neighbor for ten years.

*Re-cross.*

Decedent asked witness to perform the marriage ceremony, and he did so; this took not over five minutes; the decedent was sitting up during all the ceremony, without any support. The witness is not an attorney-at-law, but is a Justice of the Peace.

This was the principal witness for the proponent; his blunders, prevarications, obstinacy and ignorance have made all the trouble in the case. He swore positively that the decedent's subscription to the will was made before the signature of the witnesses, and then swore just as positively that it was made after the witnesses signed.

Charles Davis, the other subscribing witness, called by proponent, testified: He resides at Bergen Point, New Jersey; knew the decedent eight years; was sent for to come to the proponent's house on the day of the signing of this paper propounded. When he got there, he was requested by decedent to sign it, as a witness to his last will and testament; did not see the decedent execute the paper; the signatures of Miller and Fisher were on the paper before this witness came there, and before this witness signed it; Mr. Miller was there when this witness came in; don't remember of Dr. Fisher being there; this witness asked decedent if he, witness, ought not to read the paper before he signed it as a witness; decedent said it did not make any difference: "If you wish to read it, do so; I acknowledge it as my last will and testament." Decedent's mind seemed clear; witness signed the paper about ten minutes after this request, in the same room, and before leaving it.

*Cross-examined:*

Decedent was in bed, in a reclining position, bolstered up with pillows; while witness was there, decedent did not sit up, unsupported; did not have much conversation with him; he appeared very feeble; supposed he would not live long.

Anna M. Jackson, the proponent, testifies that the decedent gave her the paper propounded; she put it away and kept it.

David S. Jackson, called for proponent, testified that he was the brother of decedent; got to decedent's house at eleven in the morning of the day of his death; the decedent was as sensible as the witness is.

As a matter of fact, the Surrogate concluded, from the testimony, that the will was subscribed by the testator before the declaration, and before the signatures of the witnesses thereto were affixed. There can be no question of this, as regards the signature of the witness, Davis; and the presumption is strong as to that of the blundering and incomprehensible witness, Miller, the New Jersey Justice of the Peace.

Upon this testimony, therefore, the Surrogate, on the 20th September, 1865, decreed probate of the will. From this decree, Moses W. Sherwood Jackson, by his general guardian, Elsie Farrand, appealed to the Supreme Court. On the 10th day of April, 1867, the Supreme Court affirmed the decree of the Surrogate. Moses W. Sherwood Jackson, by his general guardian, appealed from this judgment on the 16th May, 1867, to the Court of Appeals. On the 20th July, 1868, the Court of Appeals reversed the judgment of the Supreme Court, and the decree of the Surrogate, and ordered that a new trial be had before the Surrogate.

A certified copy of the opinion of the Court of Appeals was filed in the Surrogate's office. It was delivered by his

honor, Judge Woodruff, and the portion of it which treats of the question of formal execution is as follows :·

"The question whether if the witnesses sign their names before the will is subscribed by the testator, has come under consideration in England, under the statute of 1*st Victoria, chap.* 26, § 9, which differs but little in its provisions touching the execution of wills from our own. Thus: 'It shall be signed at the foot or end thereof, by the testator, or by some other person in his presence, and by his direction; and such signature shall be made or acknowledged by the testator in the presence of two or more witnesses present at the same time, and such witnesses shall attest and shall subscribe the will in the presence of the testator, but no form of attestation shall be necessary.' So far as the words of the statute bear upon this question, I do not perceive that there is any material difference between the English statute and our own. Both require subscription, or signing by the testator, or an acknowledgment thereof by him in the presence of each of the witnesses; both contemplate the attestation of that fact by such witnesses by their subscription.

"On several *ex parte* applications for probate of wills in the Prerogative Court of Canterbury, such probate has been refused when it appeared that the witnesses signed before the testator, and in one of the cases the testator first read the will aloud in their presence, then requested them to sign, and they having done so he immediately signed it in their presence. In one case the question of probate was discussed by counsel, and the rule was affirmed, though the will was admitted on the ground that it did not appear, upon a review of all the evidence, that the witnesses signed before the testator. And in some cases where the testator signed in the presence of one witness, who also signed, and afterwards the testator acknowledged the execution to both, but the first did not again sign, the execution was held defective.

"Our statute on this precise point reads, 'There shall

be at least two attesting witnesses, each of whom shall sign his name as a witness at the end of the will, at the request of the testator.' (See *in the goods of Olding*, 2 *Curteis*, 865; *in the goods of Bird*, 3 *Curteis*, 117; *Cooper* v. *Babet*, 3 *Curteis*, 648; *in the goods of Allen*, 2 *Curteis*, 331; *in the goods of Simmonds*, 3 *Curteis*, 79; *Moore* v. *King*, 3 *Curteis*, 243.)

"They are, in and by this act of signing their names, to attest not only the signing or acknowledgment, but his cotemporaneous declaration that it is his will. Their signatures do not attest the signing by the testator if they are placed there before the will is signed by him. For some period longer or shorter, as the case may be, those signatures attest no execution. They certify what is not true. When and in what moment do they begin to operate as a compliance with the statute?

"The only reply that can be given is: When the testator signs his name. This is a dangerous construction of the statute. May the testator keep these signatures in his possession one hour, one week, or one year, and then add his signature? Certainly not, unless he summons the same persons to see him sign, or hear his acknowledgment thereof.

"But suppose he adds his signature and dies, what then becomes of the presumption of due execution, arising from the apparent regularity, and the due form of the attestation clause? Once let it be settled that witnesses may sign before the testator, and all presumption of due execution, when witnesses are dead, or beyond reach, ceases.

"If it be said that witnesses will not sign, and so leave their names in the possession of testator. To suppose they would is to impeach their honesty, and it is the presumption of man's truth and honesty which makes regularity, and formal attestation *prima facie* evidence of due execution. I do not think this a sufficient answer. The statute contemplates acts, each of which is serious and

important; execution and the attestation thereof bear a plain relation to each other, in point of time, in the good sense and common apprehension of every one, and the statute prescribing the requisite formalities to a valid execution and authentication plainly contemplates that the acts of the witnesses shall attest the signing, and declaration of the testator, as a fact accomplished.

"*I was at first inclined to think that, if the whole was done at the same interview,* the attestation by the signing of the witnesses might be done in any part of it, without regard to the order of events, as above suggested the acts of the testator may be; but, upon further reflection, I am satisfied that the view taken of the subject by the Ecclesiastical Court in England best conforms to the language and intent of the statute. The signing or acknowledgment by the testator, and his declaration that the instrument is his last will and testament, are, in the statute, made cotemporaneous, and neither must necessarily precede the other; and yet, in practice, this must be construed to mean on the same occasion, each a part of the same transaction, and not requiring that the words of declaration should actually accompany the movement of the pen in signing, or be actually embraced in the terms of acknowledgment of such signing. Practically, which utterance is first, is of no possible importance.

"While the attestation by witness is of a past transaction, it is so in its nature, and so in the ordering, and I think meaning of the statute. This distinction, if it served no useful purpose, if the contrary was liable to no danger, nor led to any abuse, might be deemed a too strict adherence to the literal interpretation of the law. But reasons I have suggested already, I think, show that a strict adherence to the statute is demanded.

"Upon the ground that, according to the testimony, as it appears in the case before us, the witnesses signed before the testator, the judgment of the Supreme Court should be reversed.

"There is, perhaps, reason to apprehend from the somewhat disconnected, and not always quite definite and intelligible manner of the witness, that he may not have intended to be understood as saying that the witnesses signed first, and yet his testimony so reads. If there is any mistake on that point, it will be corrected on the trial, which the reversal of the judgment of the Supreme Court will render necessary.

"Assuming the proof to show *that the first two witnesses, by request of the testator, wrote their names before the mark of the testator was made, this* does not render the execution invalid. It was not according to the natural and orderly succession of the acts, but it is sufficient, if in truth, as a part of the one transaction, the witnesses do witness the fact of subscription, and leave their signatures there, in attestation thereof. If then and there all the acts are done which, by the statute, make up valid execution, *neither the statute nor sound reason requires any precise order of these acts as indispensable.* (*Lewis* v. *Lewis*, 13 *Barb.*, 25; *Doe* v. *Roe*, 2 *Ib.*, 205; *Seguine* v. *Seguine*, *Ib.*, 394, 5; *Reeny* v. *Whitmarsh*, 16 *Ib.*, 145)."

Upon the filing of the remittitur and of this opinion, with the Surrogate, the question was raised whether the Court of Appeals could order a new trial before the Surrogate. Counsel were heard upon the motion to place the proceeding upon the Surrogate's calendar for a new trial.

THE SURROGATE. Upon the first consideration of the order of the Court of Appeals, I was pretty clear that I could not recommence this proceeding as it directed; but upon a fuller investigation of the statute, I have concluded, that, though the power assumed so frequently by the Supreme Court, to send back a will to be tried by a Surrogate, is, at the best, a doubtful power, the Court of Appeals may do so, beyond a doubt.

On appeals from decrees of Surrogates to the Supreme

Court, the practice is not under the Code of Procedure, but under the provisions of the Revised Statutes. (See *Code*, § 471.)

Proceedings upon appeals from Surrogates' decrees, admitting wills to probate, are regulated by § 13 (90), 3 *R. S.*, *5th ed.*, *p.* 905, *et seq.*, and § 71 (55), same volume, *pp.* 150, 151, *et seq.*

Section 73 (p. 151) provides: "If it appear to the Supreme Court that the decision of the Surrogate was erroneous, he (it) may, by order, reverse such decision; and, if such reversal be founded upon a question of fact, shall direct a feigned issue to be made up, to try the questions arising upon the application to prove such will."

Section 18 (p. 905) provides that "the Supreme Court shall hear the allegations of the parties, upon the proofs submitted by them to the Surrogate, and shall affirm or reverse the decision of the Surrogate, as shall be just."

These are all the provisions of the Revised Statutes affecting proceedings of this nature, on appeal to the Supreme Court. It would appear to be clear, from them, that the Supreme Court must either affirm or reverse the Surrogate's decree; and that if it reverse it on a question of fact, it must send the question to a jury.

In the present case, the Supreme Court, taking the same view of the testimony concerning the *factum* of the will as was taken by the Surrogate, simply affirmed the decree of probate.

The Code (*part* 1, *title* 2, § 11, *et seq.*) regulates appeals from the Supreme Court to the Court of Appeals. Section 11 provides:

"The Court of Appeals shall have exclusive jurisdiction to review, upon appeal, every actual determination hereinafter made, at a General Term, by the Supreme Court, in the following cases, and no other":

"3. In a final order affecting a substantial right, made in a special proceeding, or upon a summary application, in an action after judgment."

"Section 12. The Court of Appeals may reverse, affirm or modify the judgment or order appealed from, in whole or in part, and as to any or all of the parties; and its judgment shall be remitted to the Court below, to be enforced according to law."

The power of the Court of Appeals is, therefore, much more extensive than that of the Supreme Court, on such a proceeding, appears to be. It may review every order of the Supreme Court, General Term, affecting substantial right, in a special proceeding; may reverse, affirm or modify it, and remit it to be enforced. It is this power which it has exercised over the judgment of the Supreme Court in the present case. This was a special proceeding (so defined by the Code), which went to the Supreme Court and thence to the Court of Appeals, as a special proceeding. The Supreme Court has obeyed the order of the Court of Appeals, and the Surrogate must place the proceeding again upon his calendar, and try it anew.

The Court of Appeals appears to have reversed the probate on the ground that it is not certain whether the testator or his witnesses signed the will the first. In my judgment there can be no doubt, on the testimony already taken, that the testator signed first. Upon this, and, indeed, upon all the questions of probate, a new trial must, however, be had.

The Surrogate set the proceedings down for a new trial, and proofs were again taken, beginning on the 25th day of February, 1869.

The first witness called for proponent was Francis P. Miller. The contestants objected that he was incompetent as a witness, because of interest, being nominated as an executor in the paper propounded; which objection the Surrogate overruled. The contestants then objected that he was incompetent because he was a party to this proceeding against the heir-at-law and next of kin, notwithstanding any renunciation of his right of executor-

ship. The Surrogate ruled that Miller could not be a party to the proceeding, being neither the proponent, next of kin, heir-at-law, nor claiming interest under any other testamentary paper. The witness was then examined, and testified, in the main, as upon the former trials. Upon the question of the order of the execution of the paper propounded he testified as follows:

Q. I want to know what he said to you after the witnesses were in the room, and he had signed it; what he said to you in regard to putting your names down, if he said anything? A. He did not say anything more than what I have stated; he said "I will make the cross—witness it."

Q. Do you mean that he said to you to witness it? A. Yes, sir; he spoke to me.

Q. Spoke to you and directed it; you and Mr. Fisher? A. Yes, sir; he said "get your witnesses; get good witnesses; get freeholders;" so I selected Mr. Fisher.

Q. When he said to you, after his cross was made, to witness it, did he make that remark to you, or to Mr. Fisher, or to whom? A. He made it to me more than to Mr. Fisher, I think; we were both present.

Q. Did you thereupon sign your name as witness? A. Yes, sir, I did; and I wrote the name below, also.

Q. Did Mr. Fisher sign it? A. Yes, sir, in my presence.

Q. Who signed it first? A. I think I did; I am not positive, but I think I did.

Q. Can you tell by looking at the paper (hands witness the paper propounded)? A. I should judge I signed it first, in consequence of making the cross.

Q. Were they signed in the order in which the names appear there? A. I presume they were.

Q. Have you any doubt about it? A. No, sir; I don't think I have; I am not positive; I can't say positively about that, whether Mr. Fisher signed before me or not.

*Cross-examined:* * * *

Q. Did you write the words at the foot of the will,

"Moses W. S. Jackson, his mark?" A. I did; I wrote the words "his" and "mark" below.

Q. Did you write those words before or after he made the mark? A. After he made the mark there.

Q. You are sure of it? A. Yes, sir; I did. That is my usual way, for the simple reason that I expected him to sign it, and being unable to do so, consequently he made his cross.

Q. When you presented the will to him he was unable to sign it? A. Yes, sir.

Q. When you presented the will to him for signature did he take it in his hands? A. Yes, sir; he took it. He might have had something before him; I cannot designate particularly what the article was.

Q. Did you hold the ink-stand? A. No, sir.

Q. Did you bring him a pen full of ink? A. Yes, sir.

Q. Did he take the pen in his hand and try to write? A. Yes, sir.

Q. What was the difficulty that he could not write? A. His hand trembled.

Q. Very much? A. Yes, sir.

Q. Where was Mr. Fisher when that cross was made? A. Mr. Fisher was present, at his side; the other side of the bed.

Q. Did he ask you to get these witnesses before he made that cross? A. Yes, sir; twice. He told me to get witnesses.

Q. Did the witnesses sign it? A. Yes, sir.

Q. And then he made his cross? A. He made his cross first.

Q. Do you recollect when you were examined before the present Surrogate in 1865, being asked, "Did they (the witnesses) sign the will before it was executed, or afterwards?" A. I do.

Q. Do you recollect your answering, "The witnesses signed it and he made his cross?" Did you or did you not say that? A. My answer was as I understood the

question, meaning that the witnesses signed it after the testator ; that was my meaning.

Q. Do you recollect then being asked this distinct question, " Did he make the cross before or after they signed it ?" and you answering, " Afterwards." Did you, or did you not so answer ?   A. I think I recollect the question.

Q. Did you, or did you not answer as I state ?   A. My answer was " afterwards," meaning that the witnesses signed it after the testator; no other meaning was conveyed, because that was the case.

Q. Do you mean to say that, when in reply to the question, " Did he make his cross before or after they signed it ?" you answered, " afterwards," you meant " before " ?   A. No; I meant that he signed it before the witnesses signed it; " afterwards," meaning that the witnesses signed it.

Q. When you were asked, " Did he make his cross before or after they signed it ?" and you said " afterwards," you meant the " afterwards " to apply to the witnesses ? A. I said " afterwards "—the witnesses signed it after the testator—that is the meaning that I entertained, and that is the intention and answer, that the witnesses signed it after the testator.  I said " afterwards," according to the meaning of the question, that I thought was the meaning.

Q. I will ask you the question now, " Did he make his cross before or after they signed it " ?   A. He made his cross before they signed it; that I am positive of.

Q. You don't answer " afterwards " now ?   A. No, sir; " afterwards " transposes the two words—it might have been so—but I said " afterwards," and made the answer according to the meaning of the question ; " afterwards," that is, after he had signed it the witnesses did sign it.

Q. Do you recollect on your former examination being asked when you wrote those words, " Moses W. S. Jackson," at the foot of the will, and you answering, " I wrote it after the will was executed, the same day, the same morning, as soon as ever I completed it ?"   A. No, sir, not as soon as I completed it.

Q. Did you say so on your former examination? A. Not that I recollect; I don't recollect that.

Q. Do you recollect that you handed him the pen when he made his cross there? A. Yes, sir; I am certain of that, yes, I am positive that I handed him the pen.

Q. Did he touch the paper with the pen? A. I cannot say whether the pen touched the paper or not; but I know he attempted to write and was too feeble to do so.

＊　　　＊　　　＊　　　＊　　　＊

Q. You cannot recollect any reason for delay after the marriage certificate was signed? A. No, sir, I don't know that there was any necessary delay.

Q. Now, do you recollect that the execution of that will was delayed until the arrival of Mr. Davis? A. Certainly it was, it could not be executed without, it required another witness; according to the law we must have two, exclusive of my signature.

Q. Was the signing of the will by Mr. Jackson delayed until after Mr. Davis came? A. No, sir.

Q. He signed it before Davis came? A. Yes, sir; of course he did; he signed it before I signed it.

＊　　　＊　　　＊　　　＊　　　＊

Q. I want to know whether the signing of the will by Mr. Jackson, himself, was delayed to wait for Davis? A. No, sir; no, sir.

Q. Then is it not true that, between the signing of the marriage certificate and the signing of the will by Jackson, there was no delay to your recollection, and no cause for delay? A. No delay, other than what I have stated before; if there was any delay, it was occasioned by the absence of Mr. Davis.

Q. Did not you say, just now, that you did not delay it to wait for Mr. Davis; what do you mean? A. Mr. Davis was sent for; his name was mentioned with Mr. Fisher's; and while the boy or man, Mr. Fisher, I presume, went for Mr. Davis, I signed the will; also, did Mr. Fisher; and in a short time afterwards Mr. Davis

same in and signed it, and he was the last one that signed it.

Q. Was the signing of it by Jackson kept back until Davis came ? A. No, sir; no, sir.

Q. I ask you again, was there any delay after the marriage certificate was signed in the signing of the will by Jackson ? A. No, sir; no, sir; all the delay was in consequence of Mr. Davis.

Q. You say at one time that the signing of the will was not delayed for Davis to come, and the next moment you say it was ? A. No, I mean what I said; nothing more nor less; I say that the testator signed it first; after that I signed it, and Dr. Fisher signed it; and while we were signing it we sent word for Mr. Davis, and Mr. Davis he came in just after we had signed it; there was no other delay, that I know of, than that; that is all.

Q. Now, I ask you, for I want to distinctly understand it, whether, after that marriage certificate was signed, there was any delay whatever in the signing of the will by Jackson or any cause for delay ? A. No, sir; not that I know of; no, sir.

Q. Do you recollect the question being put to you on your former examination: "What was done about the certificate?" and your answering "I drew it up, he signed it, and I gave it to Mrs. Jackson;" did you say so ? A. No, sir; that is a clerical error; he never signed it.

Q. Did you say so ? A. I never meant to, or anything of the kind.

Q. Did you say so ? A. Not to my recollection; it is a thing never done, and never required.

Other witnesses were examined upon the question of general execution, and mental competency, but no other evidence was adduced as to the order of the execution of the paper propounded as a will.

The Surrogate made a decree, on the second day of April, 1869, as follows:

A decree having been heretofore made by this Court,

that is to say, on the 20th day of September, in the year 1865, by which it was adjudged that a certain instrument in writing, bearing date the 11th day of August, 1862, propounded as the last will and testament of Moses W. S. Jackson, deceased, was duly executed as and for the last will and testament of the said Moses W. S. Jackson, deceased; that the same is genuine and valid; that the said Moses W. S. Jackson, at the time of executing the same, was in all respects competent to devise real and personal estate, and was not under any restraint; and that the said instrument in writing be, and the same was thereby established as a will of real and personal estate, and that the same be admitted to probate; which said last will and testament is recorded in the office of said Surrogate in Liber 158 of Wills, page 189; and an appeal having been taken to the Supreme Court from the said decree by Moses W. Sherwood Jackson, a legatee named in said will, by Elsie Farrand, his guardian, and such proceedings having been had on such appeal, that at a General Term of the said Supreme Court, held at the city of New York, on the 10th day of April, in the year 1866, it was ordered adjudged and decreed that the said decree of the said Surrogate be, and the same was thereby affirmed as to each and every part thereof, without costs;

And the said Moses W. Sherwood Jackson, by his said guardian, having appealed from the said last mentioned judgment to the Court of Appeals, and such proceedings having been thereupon had that at a Court of Appeals, held at the city of Albany on the 20th day of July, in the year 1868, it was ordered that the said judgment of the said Supreme Court, and also the aforesaid decree of the said Surrogate, be, and the same were thereby reversed, and a new trial was ordered before the said Surrogate, without costs on appeal; and thereupon a remittitur from the said Court of Appeals was sent down to the Supreme Court; and by the said last mentioned Court, the judgment of the said Court of Appeals was,

on the 30th day of July, in the year 1868, made the judgment of the said Supreme Court;

And thereupon, in obedience to the said judgment of the Supreme Court and of the said Court of Appeals, it was ordered by the said Surrogate, on the 10th day of October, in the year 1868, after due notice to the said Moses W. Sherwood Jackson and his said guardian, and after hearing W. H. Taggart, Esq., counsel in his behalf, that the said paper propounded as the last will and testament of Moses W. S. Jackson, deceased, be again presented for probate to the said Surrogate, and that a new trial be had thereon, on the 5th day of January, in the year 1869; and the said new trial having been adjourned from day to day by consent of all the parties, and by order of the said Surrogate, the same was brought on before the said Surrogate, on the 25th day of February, in the year 1869, and adjourned from day to day;

And thereupon the said Anna Margaret Jackson, named as executor as aforesaid, having appeared by Samuel F. Cowdrey as her proctor and counsel in support of the proof of the said instrument in writing, and Moses W. S. Jackson, a legatee named in the said instrument in writing, and also the only heir-at-law of the said Moses W. S. Jackson, deceased, who has now arrived at full age, having also appeared by William H. Taggart, his proctor and counsel, in opposition to the same, and no other person having appeared in the matter, and the proofs and allegations of the said parties having been heard, and after hearing the arguments of the counsel for the respective parties so appearing as aforesaid, and the said matter having been submitted to the Surrogate for his decision and determination, and after due deliberation being thereupon had by the said Surrogate; it is ordered, adjudged and decreed, and the said Surrogate doth hereby order, adjudge and decree that the said instrument in writing so propounded, as aforesaid, was duly executed as and for the last will and testament of Moses W. S.

Jackson, deceased, that the same is genuine and valid; that the said Moses W. S. Jackson, at the time of executing the same, was in all respects competent to devise real and personal estate, and was not under any restraint; and that the said instrument in writing be and the same is hereby established as a will of real and personal estate, and that the same be readmitted to probate.

And it is further ordered, adjudged and decreed, that the said last will and testament be again recorded, and that the proofs and examinations now taken in respect to the same be recorded.